*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re FINNISTER, Minors.

UNPUBLISHED
May 30, 2024

Nos. 365924; 365925
Wayne Circuit Court
Family Division
LC No. 2019-002251-NA

Before: FEENEY, P.J., and M. J. KELLY and RICK, JJ.

PER CURIAM.

In this consolidated appeal,[1] respondent-mother appeals as of right the trial court's order terminating her parental rights to AMF, ANF, and AYF (collectively, "the children") pursuant to MCL 712A.19b(3)(c)(*i*) (conditions leading to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (proper care and custody), and (j) (reasonable likelihood of harm). Respondent-father appeals as of the right the trial court's order terminating his parental rights to the children pursuant to MCL 712A.19b(3)(a)(*ii*) (desertion of child for 91 or more days and custody not sought), (c)(*i*), (c)(*ii*), (g), and (j). For the reasons stated herein, we affirm.

Petitioner filed a temporary custody petition against respondents after Children's Protective Services (CPS) discovered that ANF had a baseball-size bruise on her forehead and arm pain. Subsequently, the trial court took jurisdiction of the children and placed them in foster care after respondents pleaded no contest to the following facts. Respondent-father physically abused ANF, causing a large bruise on her forehead and an injury to her shoulder. ANF had multiple bruises all over her body that were indicative of abuse. Additionally, respondent-father also beat ANF "over a granola bar." Respondent-mother improperly supervised AMF by allowing her to wander outside of a building alone on Halloween while respondent-mother was inside. Respondents initially refused to allow CPS to conduct a home assessment. Once CPS did assess the home, it found the home had a foul odor, holes in the wall, and the pet dog was covered in feces. Subsequently, a safety plan was put into place that removed respondent-father from the

---

[1] *In re Finnister Minors*, unpublished order of the Court of Appeals, entered May 10, 2023 (Docket Nos. 365924 and 365925).

home. There was "a preponderance of evidence that physical abuse and failure to protect occurred."

After the children had been out of their parents' care for approximately three years, the trial court found statutory grounds for termination of respondent-mother's parental rights[2] under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j) because she did not maintain a suitable home, failed to remedy the domestic violence relationship with respondent-father, and continually allowed respondent-father to be in her home. The trial court found statutory grounds for termination of respondent-father's parental rights under MCL 712A.19b(3)(a)(*ii*), (c)(*i*), (c)(*ii*), (g), and (j) because respondent-father did not do most of what his parent agency agreement (PAA) required, did not visit the children for over a year, failed to provide proof of his current employment, and refused drug screenings.

At the best-interests hearing, the trial court found that respondent-father did not make a serious effort toward addressing his PAA. Respondent-mother did engage with her PAA, and was still bonded to the children. However, the trial court found that allowing respondent-mother additional time to address her issues would not be in the best interests of the children because of the age of the case. The trial court recognized that respondent-father's presence when respondent-mother was visiting the children was still a concern. The trial court was unpersuaded that the children were on a path of reunification in light of ANF's extreme reactions after visits. Additionally, the trial court found that the children would likely not do well if placed together in the same home, so the children were placed in separate foster homes. The trial court also found that respondents did not make substantial progress toward reunification during the three years that the case was open, and that the children would be provided with stability in foster homes, especially in light of their bond with their foster families. Therefore, the trial court determined that termination of the respondents' parental rights was in the children's best interests.

## I. RESPONDENT- MOTHER

On appeal, respondent-mother first argues the trial court clearly erred when it found that petitioner made reasonable efforts to reunite respondent-mother with her children prior to seeking

---

[2] Unfortunately, the trial court did not state on the record or in its order which statutory grounds it relied upon in finding clear and convincing evidence to terminate these parents' parental rights. The supplemental petition filed on September 9, 2022 states that DHHS requested termination pursuant to MCL 712A.19(3)(a)(ii), (c)(i), (c)(ii), (g), and (j). Without stating which statutory grounds it relied upon, the trial court's March 27, 2023 Order merely states: "The Court previously found grounds for termination of parental rights of the father, John Finnister and the mother, June Dillard to their three chidlren [sic, [AYF], [ANF], and [AMF]. The parents have not made significant progress towards reunification in the 3 years that the children have been in care. They can best be provided with stability i[n] foster homes and the children are bonded to their respective caregiver[s] and happy in the homes that they are in." Appellate review is aided through specific reference to each statutory ground and the clear and convincing evidence submitted with respect to each statutory basis supporting termination.

termination of her parental rights. We conclude that the trial court did not plainly err by finding petitioner made reasonable efforts to help respondent-mother reunify with the children before seeking termination of her parental rights because petitioner offered respondent-mother many services, transportation, and food resources.

A trial court's decision to terminate a parent's parental rights and its decision regarding the children's best interests are reviewed for clear error. *In re Trejo*, 462 Mich 341, 356-357, 612 NW2d 407 (2002) ("We review for clear error both the court's decision that a ground for termination has been proven by clear and convincing evidence and, where appropriate, the court's decision regarding the child's best interest."); see also MCR 3.977(K). Because respondent-mother did not challenge the adequacy of petitioner's efforts or request additional accommodation for her blindness[3] prior to termination of her parental rights, this issue is unpreserved. *In re Atchley*, 341 Mich App 332, 337; 990 NW2d 685 (2022). "[U]npreserved issues are reviewed for plain error affecting substantial rights." *In re Sanborn*, 337 Mich App 252, 258; 976 NW2d 44 (2021) (quotation marks and citation omitted). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. (citations omitted). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Id*. (citation omitted).

Generally, the Department of Health and Human Services (DHHS) "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *Id*. (citation omitted). "In general, when a child is removed from the parents' custody, the petitioner is required to make reasonable efforts to rectify the conditions that caused the child's removal by adopting a service plan." *Id*. (citation omitted). "[T]he Department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id*. at 259 (citation omitted). "Reasonable efforts to reunify the child and family must be made in all cases except those involving aggravated circumstances under MCL 712A.19a(2)." *Id*. (citation omitted). Efforts at reunification of a parent and child cannot be reasonable unless DHHS modifies its services as reasonably necessary to accommodate a parent's disability. See *In re Hicks/Brown*, 500 Mich 79, 85-86; 893 NW2d 637 (2017) ("Absent reasonable modifications to the services or programs offered to a disabled parent, the Department has failed in its duty under the [Americans with Disabilities Act[4]] to reasonably accommodate a disability.").

Respondent-mother was given a PAA that outlined everything she needed to accomplish in order to reunify with her children. Among other things, her PAA required her to maintain

---

[3] The foster care case manager Britany Molnar referred respondent-mother to the Greater Detroit Agency for the Blind in November 2020 and worked with mother and the agency throughout 2021 and beyond to ensure mother's engagement with services to learn to walk with a cane, obtain transportation services, learn braille, obtain occupational therapy, obtain computer literacy, use an adaptive laptop and label reader, obtain a home caregiver, mobility and safety training, safe cooking lessons, and employment services.

[4] 42 USC 12101 *et seq*.

suitable housing and attend visits with her children. Additionally, a safety plan was established to keep respondent-father away from respondent-mother and her home, and respondent-father was not allowed to attend unsupervised visits with the children. Respondent-mother argues that she was not given a care provider or services to help her clean her house (maintain suitable housing), travel to visits, and keep respondent-father away from her, and that petitioner's failure to provide her with these specific resources caused her to be unable to comply with her PAA.

Contrary to respondent-mother's claim, she was provided with in-home care and transportation. Moreover, respondent-mother attended most of her visits, and her home was suitable at various times throughout the case, demonstrating that she had the transportation she needed to visit her children, along with the resources she needed to maintain a suitable home. Further, because respondent-mother is legally blind, she was provided with many disability services to help her navigate the challenges of daily life, in which she regularly participated. These disability services included braille lessons and training to help respondent-mother navigate her disability in order to conduct "daily tasks and living." That respondent-mother failed to benefit from these services and maintain her home in a suitable fashion is not petitioner's fault. See *In re MJC*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 365616); slip op at 9 ("Although DHHS has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of the respondent-parent to participate in the services and demonstrate having benefited from them.") (citation omitted).

Respondent-mother also argues that, had she been provided with more help, she could have gotten a Personal Protection Order (PPO) to keep respondent-father away from her. However, this argument is disingenuous because respondent-mother was prompted to get a PPO, but refused to do so. Respondent-mother's failure to keep respondent-father away from her and the children, which resulted from her refusal obtain the PPO, indicated that she was not willing to comply with the safety plan and not that she was unable to. Respondent-mother also ultimately denied any domestic violence behavior between herself and respondent-father despite the January 2021 attack she endured and admitted to Ms. Molnar; Ms. Molnar testified that she saw respondent-mother shortly after respondent-father took her food and damaged the front door, leaving respondent-mother bruised, injured, and visibly shaken.

Respondent-mother also argues that the trial court clearly erred when it found statutory grounds for termination under MCL 712A.19b(3)(c)(*i*), (g), and (j) because respondent-mother was in substantial compliance with her PAA at the time of the termination hearing. Respondent-mother failed to challenge the trial court's findings under MCL 712A.19b(3)(c)(*ii*), however, therefore, even if respondent-mother successfully challenged the trial court's findings regarding the other statutory grounds, the trial court's decision to terminate respondent's parental rights would not require reversal because it also relied upon MCL 712A.19b(3)(c)(*ii*), which respondent-mother did not challenge. See *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011) ("Only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds."). Because petitioner conceded that MCL 712A.19b(3)(c)(*ii*) was not a proper ground for termination of respondent-mother's parental rights, however, we will review the other statutory ground asserted in the supplemental petition and challenged on appeal.

Parents have a "fundamental right to direct the care, custody, and control" of their children. *In re Ferranti*, 504 Mich 1, 21; 934 NW2d 610 (2019) (citation omitted). Pursuant to MCL 712A.19b(3)(c)(*i*), a court may terminate parental rights if the respondent was in a proceeding pursuant to this chapter, "182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . [t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." The conditions that led to the children's removal from respondent-mother included her failure to protect the children from respondent-father, improper supervision, and unsuitable housing. Respondent-mother's PAA required her to attend all court hearings, medical appointments for the children, weekly parenting time visits, and domestic violence treatment; participate in disability services, individual counseling, mental health services, and parenting classes; participate in a psychiatric and psychological evaluation, and follow the recommendations; and maintain suitable housing, a legal source of income, and contact with DHHS.

Respondent-mother was given almost 3 years[5] to remedy the issues which led to the children's removal—far more than 182 days. During that time, respondent-mother regularly attended court hearings, went to most of the children's medical appointments of which she was informed, attended the majority of her scheduled visits with the children, regularly engaged in disability and mental health services, complied with her individual counseling, completed her parenting classes, maintained income, and remained in contact with DHHS. However, respondent-mother did not complete her domestic violence treatment plan, benefit from the domestic violence classes in which she participated, or maintain suitable housing. In addition, respondent-mother also failed to properly supervise the children during visits and violated petitioner's rules for the unsupervised visits. Domestic violence, improper supervision, physical abuse, and unfit home were the conditions which led to the adjudication. Here, the trial court did not clearly err by finding that conditions which led to the adjudication continued to exist, specifically the domestic violence, improper supervision, and unfit home. Respondent-mother had five separate homes during the case and was unable to rectify the existence of garbage, rotting food, and general filth in each home. Food insecurity also continued to be a pervasive issue throughout the children's lives and was unresolved.

In addition to the services the trial court ordered respondent-mother to participate in to resolve the issues that led to the adjudication, the trial court implemented a safety plan to keep respondent-father away from respondent-mother, the children, and respondent-mother's house. Respondent-mother was told multiple times that she was not allowed to have respondent-father in her home while the children were there for unsupervised visits. However, both times respondent-mother was allowed to have unsupervised visits in her home, she allowed respondent-father to be present, resulting in the visits returning to the agency. Prior to those visits, respondent-mother admitted that respondent-father physically abused ANF, yet she still allowed him to be present with her children even when she was told he could not be there. Respondent-father was often seen at respondent-mother's house and overheard in the background while respondent-mother talked

---

[5] The trial court observed that the case began on January 3, 2020, and the best interest hearing concluded on February 16, 2023.

on the phone with her children or foster care workers, thereby violating the safety plan. Respondent-mother refused to get a PPO after respondent-father physically abused her and damaged her home. As a result of respondent-mother failing to take the steps necessary to keep respondent-father away from her home and children, although given a reasonable amount of time and opportunity to do so, it was not clearly erroneous for the trial court to find the conditions leading to adjudication continued to exist. MCL 712A.19b(3)(c)(*i*).

Additionally, given the length of time the children were in care, we conclude that the trial court did not clearly err when it found there was no reasonable likelihood that respondent-mother was going to remedy those conditions within a reasonable amount of time given the young ages of these children who were 9, 7 and 3 when the case began (now 12, 10, and 5). See *In re White*, 303 Mich App 701, 712; 846 NW2d 61 (2014) (holding that the respondent would likely not be able to rectify the conditions that led to the adjudication because she failed to do so during the two-year period she was given).

[Moreover, pursuant to MCL 712A.19b(3)(j), a court may terminate parental rights if it finds clear and convincing evidence that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." Exhibiting behavior that would put a child at a risk of harm is sufficient to justify terminating parental rights under MCL 712A.19b(3)(j). The trial court did not clearly err by finding clear and convincing evidence to terminate respondent-mother's parental rights under MCL 712A.19b(3)(j) because, respondent-mother failed to comply with the terms of her treatment plan regarding domestically violent relationship with respondent-father. See *White*, 303 Mich App at 713 (holding that failure to comply with a service plan is evidence that the child will be harmed if they are returned to the parent's home).

The trial court concluded that there was a reasonable likelihood the children would be harmed if returned to respondent-mother's home; this was also not clearly erroneous because of respondent-mother's failure to keep respondent-father away while the children were in her care and both pled no contest that respondent-father physically abused ANF. See *id*. at 713 (holding that exhibiting behavior that would put the children at a risk of harm is sufficient to justify terminating parental rights under MCL 712A.19b(3)(j)). Even though it was ANF who respondent-father abused, his treatment of her was indicative of how he may treat the other children. See *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020) (explaining that a parent's treatment of one child is probative of how they may treat other children). Moreover, respondent-father did not participate in any domestic violence counseling, indicating that he may physically abuse respondent-mother and the children if he were in an environment with them, which was likely to happen because respondent-mother refused to keep respondent-father away from the children. For these reasons, the trial court did not clearly err by finding that termination of respondent-mother's parental rights was warranted under MCL 712A.19b(3)(j).][6]

---

[6] We can eliminate the discussion of (3)(j) if you are satisfied with the analysis under (3)(c)(i).

Finally, respondent-mother argues that the trial court clearly erred when it found termination of her parental rights was in the children's best interests because respondent-mother loved her children, had a bond with them, and could provide a permanent home for all of them.

This Court reviews a "trial court's determination regarding the children's best interests" for clear error. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). Clear error exists when the reviewing court has a definite and firm conviction that a mistake was made. *In re Benavides*, 334 Mich App 162, 167; 964 NW2d 108 (2020). "Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re Keillor*, 325 Mich App 80, 93; 923 NW2d 617 (2018) (citation omitted). "Best interests are determined on the basis of the preponderance of the evidence." *Id.* (citation omitted). The trial court should consider all of the evidence when determining whether it is in the children's best interests to terminate parental rights. *White*, 303 Mich App at 713. The trial court should consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id.* (citation omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id.* at 714.

Respondent-mother argues that termination was not in the children's best interests because they had a bond with her, and she could offer the children the most stability. Though the children were bonded with respondent-mother, they were also bonded with each of their foster families. Despite having a bond with respondent-mother, ANF did not want to return to respondent-mother's home because of respondent-father's anger and violent behaviors, which respondent-mother did not protect the children from because she continued to allow respondent-father to be around the children during her visits. Further, respondent-mother could not offer the children the most stability because she failed to maintain suitable housing throughout the case. Respondent-mother also failed to keep respondent-father away from the children during her unsupervised visits, causing her visits to return to the agency, thereby delaying reunification. In short, respondent-mother failed to maintain a stable living situation where the children could visit with her, and thus, the children had a better chance of obtaining stability and permanency with their foster families. This is especially true where, as here, each of the children's foster families were willing to plan for them on a long-term basis. AMF's foster family was even willing to adopt her.

Additionally, respondent-mother's history of domestic violence with respondent-father suggested that termination was in the children's best interests due to her unwillingness to remove respondent-father from her life. See *id.* (explaining that a trial court can consider a respondent's domestic violence history while conducting a best-interests analysis). A particularly concerning fact in this case was respondent-mother's eleventh-hour denial that respondent-father ever engaged in domestic violence or physically harmed his family members. At trial in August, 2020, respondent-mother admitted that respondent-father physically abused ANF. In January, 2021, respondent-mother reported an incident when respondent-father pushed her down, causing her serious injuries, and originally stated that she would get a PPO against respondent-father. Respondent-father even admitted that he had a history of domestic violence with respondent-mother. Then, during her clinic report interview around February, 2023, respondent-mother denied that respondent-father ever physically abused her and that they had a history of domestic

violence again. She also denied that the children witnessed physical abuse, described her 10-year relationship with respondent-father as supportive and loving, and stated that he was a good father. Accordingly, the domestic violence and respondent-mother's denial thereof weighed in favor of terminating respondent-mother's parental rights.

Respondent-mother's failure to obtain suitable housing also supported that termination was in their best interests. See *id.* (explaining that a respondent's failure to complete their case service plan indicates that termination may be in the children's best interests). Consistently throughout the case, respondent-mother's home had been full of bugs, rotting food, dirty dishes, cigarette butts, ash, and open bottles of pop and beer. Respondent-mother also lacked the furniture and bedding she needed to properly house her children. Finally, the children's behavioral needs were exacerbated when they were placed with a sibling, indicating that their continued placement with separate foster families was in their best interests. In light of the foregoing, we conclude that the trial court did not clearly err when it found that termination of respondent-mother's parental rights was in the children's best interests.

## II. RESPONDENT-FATHER

Respondent-father argues the trial court clearly erred by finding it was in the children's best interests to terminate his parental rights because he had a bond with the children, could raise them in their Muslim beliefs, and could continue assisting respondent-mother in caring for them while he worked on completing his PAA. Although respondent father failed to comply with any of the terms in his PAA, he argues that the termination was unnecessary and stated that respondent-mother could care for the children while he improved his situation. We agree that termination of respondent-father's parental rights was not clearly erroneous. *In re Trejo*, 462 Mich at 356-357.

Respondent-father did not complete his PAA, which supports the trial court's conclusion that it was in the children's best interests to terminate his parental rights. *White*, 303 Mich App at 714. Respondent-father also did not have a house for the children to stay in, and never verified that he had employment. The children did not have a close bond with respondent-father. Respondent-father's infrequent visits with the children also weighed in support of the trial court's best-interests determination. See *MJC*, ___ Mich App at ___; slip op at 10 (explaining that a parent's visitation history is relevant to a best-interests analysis). Additionally, respondent-father's substance abuse and refusal to take drug screens also indicated that it was in the children's best interests to terminate his parental rights. See *id.* (explaining that a respondent's history of substance abuse suggests it would be in the children's best interests to terminate the respondent's parental rights).

Respondent-father's significant mental health issues also indicated that termination was in the children's best interests. See *id.* (explaining that the psychological state of a parent is relevant to a best-interests determination). Respondent-father had suicidal ideations in 2023, appeared delusional at times, talked to himself as though he had two personalities, suffered from depression, had intermittent explosive disorder, had PTSD, suffered from alcohol abuse, had a panic disorder,

and suffered from psychoactive substance dependency.[7]  In addition, respondent-father was not treating his mental health issues.

Testimony revealed that being around respondent-father had negative effects on the children.  ANF experienced an "extreme regression" in her emotional and behavioral regulation after her visit with respondent-father in November, 2022.  AYF and AMF also exhibited worse behaviors after visits with respondent-father.  AYF was hesitant to visit respondent-father, and when AMF was asked about him, she tried to leave the room.  AYF had nightmares about respondent-father beating respondent-mother and her sister.  AYF did not want to go home and worried about respondent-mother's wellbeing.  AMF also had nightmares and did not want to return to respondents' care. The difficulty of placing the children together also supported the trial court's decision to terminate respondent-father's parental rights.  Further, respondent-father's physical abuse of ANF strongly supported the trial court's best-interests determination.  although respondents only admitted to respondent-father physically abusing ANF, a parent's treatment of one child is indicative of how they may treat other children.  *Kellogg*, 331 Mich App at 259.  Additionally, respondent-father physically abused respondent-mother in front of the children, which traumatized them.  ANF was particularly traumatized by respondent-father's abuse of respondent-mother after witnessing an incident when respondent-father choked respondent-mother.  The physical and mental trauma that the children suffered as a result of respondent-father's violent behaviors weighs strongly in support of the trial court's decision to terminate his parental rights.

Finally, respondent-father's poor parenting skills also supported the trial court's best-interests determination.  Respondent-father demonstrated his poor parenting ability by failing to engage with the children during visits, asking them inappropriate questions, yelling while the children could hear him, failing to comprehend the effect of his behavior on the children, and minimizing and denying the children's extreme emotional and behavioral struggles.  In light of the foregoing evidence, we conclude that the trial court did not clearly err when it found termination of his parental rights was in the children's best interests. MCR 3.977(K).

Affirmed.

/s/ Kathleen A. Feeney
/s/ Michael J. Kelly
/s/ Michelle M. Rick

---

[7] Respondent-father acknowledged that he exposed himself to respondent-mother's caregiver, one of the children's relative caregivers, and sent sexually explicit texts to respondent-mother's relative.